1  KEVIN C. MAYER (State Bar No. 118177)
   kevin.mayer@nortonrosefulbright.com
2  **NORTON ROSE FULBRIGHT US LLP**
   555 South Flower Street
3  Forty-First Floor
   Los Angeles, California  90071
4  Telephone:  (213) 892-9200
   Facsimile:   (213) 892-9494
5  kevin.mayer@nortonrosefulbright.com

6  Christopher Weimer (*pro hac vice forthcoming*)
   cweimer@pirkeybarber.com
7  PIRKEY BARBER PLLC
   1801 East 6th Street, Suite 300
8  Austin, Texas 78702
   Telephone:  (512) 322-5200
9  Facsimile:   (512) 322-5201

10 Attorneys for Plaintiff 3M COMPANY

11

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                      WESTERN DIVISION

15 3M COMPANY,                          | Case No. 2:20-CV-05049

16              Plaintiff,

17         v.                            | **COMPLAINT FOR
                                         | TRADEMARK
18 KM BROTHERS INC., KMJ                 | COUNTERFEITING,
   TRADING INC., SUPREME                 | TRADEMARK INFRINGEMENT,
19 SUNSHINE, INC., MAO YU, and           | UNFAIR COMPETITION,
   DOES 1 – 10,                          | TRADEMARK DILUTION, AND
20                                       | FALSE ADVERTISING**
              Defendants.
21

22                                       | **DEMAND FOR JURY TRIAL**
23

24

25      Plaintiff 3M Company ("3M") alleges as follows against KM Brothers, Inc.,

26 KMJ Trading Inc., Supreme Sunshine, Inc., and Mao Yu (collectively,

27 "Defendants"), as well as any presently unknown pseudonyms, affiliated entities, or

28 persons acting in concert with Defendants ("Does 1 – 10"):

# I.   **INTRODUCTION**

1.      This lawsuit is brought to further 3M's efforts to combat the exploitation of consumers during the COVID-19 global pandemic.  Defendants operated an illegal scheme to advertise and sell counterfeit, damaged, deficient, or otherwise altered respirators to unwitting customers.  Defendants falsely advertised these products with 3M's famous trademarks, trading on 3M's brand and reputation for products that consumers around the world trust for their superior quality and reliability.  Defendants further engaged in price-gouging and other unfair sales techniques, such as bait-and-switch tactics, in order to take advantage of consumers in need of personal protection equipment (PPE) to safeguard their health.

2.      3M has filed suit to shut down entirely this unlawful activity, protect consumers from serious harm, and protect their names and brands from being associated with defendants' unlawful and unethical efforts to profiteer from the pandemic.  Any damages awarded in this case will be donated by 3M to charitable COVID-19 relief efforts.

3.      Throughout its history, 3M has been providing state-of-art, industry-leading scientific and medical products to consumers throughout the world under its famous 3M name and trademarks.  Based on this longstanding, continuous use, consumers associate the 3M trademarks uniquely with 3M.  Now, more than ever, consumers are also relying on the famous 3M name and trademarks to indicate that the products offered thereunder are of the same superior quality that consumers have come to expect over the past century.  This is especially true with respect to 3M's numerous industry-leading healthcare products and PPE, including 3M-brand N95 respirators.

4.      Healthcare professionals and other first responders are heroically placing their health and safety on the line to battle COVID-19.  To assist in the battle, 3M is working around the clock to supply healthcare workers, first responders, and critical infrastructure operators with millions of 3M-brand

respirators.  Beginning in January, 3M began increasing its production of 3M-brand respirators, doubling its global output to a rate of 1.1 billion per year, or 100 million per month.  This includes 35 million respirators per month being manufactured and distributed in the United States, or more than 1 million respirators per day produced in the U.S. for use in the fight against COVID-19.  3M also is investing capital and resources to enable it to double its respirator production capacity once again, to 2 billion globally before the end of 2020.  In the United States alone, 3M plans to be producing respirators at a rate of 50 million per month by June 2020, and at a rate of more than 95 million per month by October 2020.  And to supplement its U.S. production, 3M also has announced a plan to import 166.5 million 3M-brand respirators from 3M's production facilities overseas.  In the United States, 90 percent of 3M's respirators are going to healthcare and public health users, with the remaining deployed to other critical industries such as energy, food and pharmaceuticals.  The U.S. distribution of 3M-brand respirators is being coordinated with the Federal Emergency Management Agency, which is basing allocation decisions on the most urgent needs.

5.     The demand for 3M-branded respirators has grown exponentially in response to the pandemic, and 3M has been committed to seeking to meet this demand while keeping its respirators priced fairly.  3M is working with customers, distributors, governments, and medical officials to direct 3M supplies to the places where they are needed most.  Importantly, 3M has *not* increased the prices it charges for 3M respirators as a result of the COVID-19 outbreak.

6.     In the midst of these efforts by 3M and the global health community to respond to the pandemic, certain bad actors have sought to exploit the crisis and prey on innocent parties through a variety of scams involving 3M N95 respirators and other health-related products in high demand.  These scams include the sale of counterfeit, damaged, deficient, or otherwise altered products, unlawful price-gouging, fake offers, bait-and-switch tactics, and other unfair and deceptive

DOCUMENT PREPARED
ON RECYCLED PAPER

practices—all of which undercut the integrity of the marketplace and constitute an ongoing threat to public health and safety.

7.     In response to the spike in fraudulent activity, price gouging and counterfeiting related to 3M N95 respirators in the marketplace during the pandemic, 3M is taking an active role to combat these activities.  3M's actions include working with law enforcement authorities around the world, including the Department of Justice, state Attorneys General, the Federal Bureau of Investigation, U.S. Attorney General, state attorneys general, and local authorities to combat price-gouging and other unlawful activities.  3M has established a dedicated point of contact for federal and state procurement officials to promptly validate third-party offers and quotes.  In doing so, 3M has already helped prevent dozens of potentially fraudulent transactions with federal agencies, state governments, municipal governments, private enterprises and other organizations.  Every U.S. Governor has been briefed on 3M's efforts, and 3M is in regular contact with numerous governors and state attorneys general regarding these efforts to prevent and combat fraud.  The Department of Justice has publicly thanked 3M for the assistance it has provided in investigations that have led to arrests.  *See* Press Release: New Jersey Man Arrested For $45 Million Scheme To Defraud And Price Gouge New York City During COVID-19 Pandemic, *available at* https://www.justice.gov/usao-sdny/pr/new-jersey-man-arrested-45-million-scheme-defraud-and-price-gouge-new-york-city-during (May 26, 2020).

8.     3M has also created a website where people can report potential price-gouging, and a "3M COVID-19 Fraud hotline" where end-users and purchasers of 3M products in the United States and Canada can call for information and help detect fraud and avoid counterfeit products.  3M is also publishing information about its anti-price-gouging and counterfeiting efforts on the 3M website, including disclosure of 3M's list prices for its N95 respirators so that customers can identify and avoid inflated prices, and the web address and phone numbers that can be used

to identify 3M authorized distributors and dealers in the United States and Canada. Further information about 3M's efforts are set forth in the 3M press release and publication attached hereto as **Exhibits 1 and 2**.

9.     A key component of 3M's efforts to combat fraud, price gouging, and counterfeiting has been the removal of bad actors through policing their activity on the internet.  3M has successfully secured the removal of more than 3,000 websites and sales offers with fraudulent or counterfeit product offerings from online marketplaces around the world, more than 4,000 false or deceptive social media posts, and more than 100 deceptive internet addresses.

10.     Including this action, 3M has filed twelve lawsuits in federal courts across the country in its fight against fraud, price gouging, and counterfeiting.  3M has won five temporary restraining orders and three preliminary injunction orders from courts across the country that put a stop to other defendants' unlawful and unethical profiteering from the pandemic.

11.     This action involves Defendants' wrongful acts as third-party sellers operating on Amazon.com ("Amazon"), and 3M's efforts to take action against those who attempt to sell counterfeit products and those who engage in price-gouging on Amazon.  During this historic health crisis, 3M has sought to aggressively protect customers from bad actors seeking to exploit the global pandemic for their own gain.

12.     Despite these extensive efforts during the COVID-19 crisis, pandemic profiteers continue to prey on and deceive consumers, including front-line healthcare workers and first responders, trading on the fame of the 3M names and trademarks, and falsely associating themselves with 3M and its reputation for providing the highest quality PPE at fair prices.  Defendants' scheme to illegally enrich themselves during the current global health crisis exemplifies pandemic profiteering.

13.     3M does not—and will not—condone bad actors deceptively trading

on the fame and goodwill of the 3M brand and trademarks for their personal gain. 3M is committed to working to address and prevent the exploitation of the surge in demand for 3M-brand products during this historic health crisis.

14.     On or about February 24, 2020, Defendant Mao Yu, who is believed to be an individual who owns and operates Defendants KM Brothers Inc., KMJ Trading Inc., and Supreme Sunrise, Inc., began selling what were advertised as authentic 3M products on Amazon.com across three accounts:  Julian Trading, Supreme Sunshine, and KM Buy.  The associated Amazon listings advertised what were purported to be 3M-branded N95 respirators listed under the title, among others, "3M OHESD 142-8210Plus 8210Plus Particulate Respirator N95 - Pack of Two Masks."

15.     In the following weeks, and until the accounts were blocked by Amazon in response to customer complaints regarding the authenticity, quality, and pricing of the products (as detailed further below), Defendants sold products advertised as 3M-brand N95 respirators as third-party sellers on Amazon.com.

16.     As described further below, Defendants' actions are in clear violation of 3M's rights.  On information and belief, Defendants' conduct includes, among other things:

    a.  selling counterfeit, damaged, deficient, or otherwise altered purported 3M-branded respirators;

    b.  engaging in price-gouging by selling purported 3M-branded N95 respirators for vastly inflated prices, at an average price per respirator across the three accounts of $23.21, which is far in excess of 3M Company's average list prices for N95 respirators of approximately $0.63 to $3.40, depending on the model.[1]  For further reference, Defendants' average price is almost 20 times 3M's posted list price of $1.27 per respirator for the same or comparable products; and

---

[1]  See **Exhibit 3**, 3M Company, Fraudulent Activity, Price Gouging, and Counterfeit Products.

c. making multiple false representations in advertising including, but not limited to, employing bait-and-switch tactics by selling non-3M respirators advertised as 3M-branded respirators, and fulfilling purchase orders with lower quantities of respirators than what was advertised.

17.     Upon information and belief, Defendants charged customers over $350,000 by the sale of purported 3M-branded N95 and other respirators they advertised under the 3M brand.

18.     3M brings this lawsuit to protect consumers from being deceived, prevent healthcare providers and procurement officers from wasting their valuable time interacting with illegitimate offers for critical health supplies, and stop Defendants' future infringement, tarnishment and dilution of 3M's name, trademarks, reputation, fame, and goodwill.  Although Defendants' original product listings seeking to defraud and price gouge consumers have been removed from Amazon, Defendants have shown a propensity to form multiple front entities to perpetuate their unlawful activities, and they may be seeking to continue their illegal acts through additional product listings by additional front entities unless and until they are enjoined by this Court.

19.     3M seeks an award of monetary damages (trebled), attorneys' fees and costs, the disgorgement of Defendants' illicit profits, prejudgment interest, and injunctive relief preventing Defendants from future unlawful acts against 3M's rights.  Any monetary awards received by 3M will be donated to charitable COVID-19 relief efforts.

## II.     THE PARTIES

20.     Plaintiff 3M Company is a Delaware corporation, with a principal place of business and corporate headquarters located at 3M Center, St. Paul, Minnesota 55144.  3M is a diversified technology company with a global presence and is among the leading manufacturers of products for many of the markets it serves, including PPE such as 3M-brand N95 respirators.

21.    On information and belief, Defendant Mao Yu is an individual residing in the State of California and is the owner and operator of KM Brothers Inc., KMJ Trading Inc., and Supreme Sunrise, Inc.

22.    On information and belief, Defendant KM Brothers Inc. is a California corporation with a principal place of business at 1519 Custoza Ave., Rowland Heights, California 91748, and doing business as "KM Buy."

23.    On information and belief, Defendant KMJ Trading Inc. is a California corporation with a principal place of business at 1519 Custoza Ave., Rowland Heights, California 91748, and doing business as "Julian Trading."

24.    On information and belief, Defendant Supreme Sunrise, Inc. is a California corporation with a principal place of business at 3321 Glenmark Dr., Hacienda Heights, California 91745, and doing business as "Supreme Sunshine."

25.    3M does not know the identity of additional affiliated entities, or persons acting in concert with Defendants and denominates them for purposes of this Complaint and action as "Does 1 – 10."

### III.    JURISDICTION AND VENUE

26.    3M's claims for trademark infringement, trademark counterfeiting, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, and false advertising, as asserted in Claims 1 through 5 below arise under the Trademark Act of 1946 (as amended; the "Lanham Act"), 15 U.S.C. §§ 1051, *et seq.*  Accordingly, this Court has subject matter jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331, 1338(a) & (b), and 15 U.S.C § 1121(a).

27.    3M's claims for price-gouging and false advertising in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, false advertising in violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, and common law unfair competition are so related to the federal claims asserted in Claims 1 through 5 below that they form part of the same case or controversy.  Accordingly, this Court has supplemental jurisdiction over

Claims 6 through 8 pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

28.     This Court also has subject-matter jurisdiction over the claims on the separate and independent ground of diversity of citizenship pursuant to 28 U.S.C. § 1332(a).  There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

29.     This Court has personal jurisdiction over Defendant Mao Yu because Yu is an individual who resides in and/or regularly transacts business in the State of California.  This Court has personal jurisdiction over Defendants KM Brothers Inc., KMJ Trading Inc., and Supreme Sunshine, Inc. because they are incorporated and headquartered in the Central District of California, and otherwise do business there. Defendants are committing, or facilitating the commission of, tortious acts in California and have wrongfully caused 3M substantial injury in California.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in the Central District of California and also because Defendants are subject to personal jurisdiction in this District.

## IV.     FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A.     Plaintiff 3M

31.     3M has grown from humble beginnings in 1902 as a small-scale mining venture in Northern Minnesota to what it is today, namely: an industry-leading provider of scientific, technical, and marketing innovations throughout the world.  Today, 3M's offers over 60,000 products, ranging from household and school supplies, to industrial and manufacturing materials, to critical medical supplies and protective equipment.

### B.     The 3M Brand

32.     3M offers its vast array of goods and services throughout the world under numerous brands, including, for example: ACE; POST-IT; SCOTCH; NEXCARE; LITTMANN; and more.  Notwithstanding the widespread goodwill

and resounding commercial success enjoyed by these brands, 3M's most famous and widely recognized brand is its eponymous "3M" brand.

33.     The 3M brand is associated with products and materials for a wide variety of medical devices, supplies, and PPE, including, for example: respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and many more.  As a result, 3M-branded products are highly visible throughout hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand.

**C.     The Famous "3M" Respirators**

34.     Over the past century, 3M has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers throughout the world (including, without limitation, its 3M-brand N95 respirator) under the standard-character mark "3M" and the 3M logo shown below (together, the "3M Marks"):



35.     For decades, products offered under the 3M Marks have enjoyed enormous commercial success including, without limitation, 3M-brand respirators. Indeed, in 2019 alone, sales of products offered by 3M exceeded billions of dollars, with the vast bulk of such products sold under and in connection with the 3M Marks.

36.     Over the same period of time, products offered under the 3M Marks regularly have been the subject of widespread, unsolicited media coverage and critical acclaim.

37.     Based on the foregoing, consumers associate the 3M Marks uniquely with 3M and recognize them as identifying 3M as the exclusive source of goods

DOCUMENT PREPARED
ON RECYCLED PAPER

and services offered under the 3M Marks. Based on the foregoing, the 3M Marks have also become famous among consumers, not only in California, but throughout the United States.

38. To strengthen 3M's common-law rights in and to its famous 3M Marks, 3M has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in International Classes 9 and 10 for, *inter alia*, respirators (the "'329 Registration"), (ii) U.S. Trademark Reg. No. 2,692,036, which covers the 3M logo for, *inter alia*, a "full line of surgical masks, face shields, and respiratory masks for medical purposes" (the "'036 Registration"); and (iii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in International Classes 1, 5, and 10 for, *inter alia*, respirators (the "'534 Registration"). True and correct copies of registration certificates for these registrations are attached hereto as **Exhibit 4**.

39. Each of these Registrations is valid, in effect, and on the Principal Register.

40. Each of these Registrations is "incontestable" within the meaning of 15 U.S.C. § 1065. Accordingly, each Registration constitutes conclusive evidence of: (i) 3M's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity of the registration of the 3M Marks; and (iv) 3M's exclusive right to use the 3M Marks throughout the United States for, *inter alia*, respirators.

41. 3M's famous 3M Marks do more than identify 3M as the exclusive source of goods and services offered thereunder. The famous 3M Marks also signify to consumers that 3M-brand products offered under the 3M Marks are of the highest quality and adhere to the strictest quality-control standards. Now, more than ever, consumers rely on the famous 3M Marks' ability to signify that products offered under the 3M Marks are of the same high quality that consumers have come to expect of the 3M brand over the past century.

1

**D.      3M's Extensive Efforts to Assist With the Battle Against COVID-**
2              **19**

3        42.      Medical professionals and first responders throughout the world are

4    donning extensive PPE as they place their health and safety on the line in the battle

5    against COVID-19.  As 3M states on the homepage of its website, it is "committed

6    to getting personal protective equipment to healthcare workers":

7

8

9

10

11

12

13

14

15

16

17        43.      Among the PPE that 3M is providing to the heroic individuals on the

18   front lines of the battle against COVID-19 are its 3M-brand N95 respirators.

19        44.      Inset, below, is an image of 3M's branded Model 8210 respirator:

20

21

22   

23

24

25

26        45.      Authentic N95 respirators reduce exposure to airborne biological

27   particles and liquid contamination when appropriately selected, fitted, and worn.

28        46.      Based on the exponential increase in demand for 3M-branded

respirators, 3M has invested in the necessary capital and resources to double its annual production of 1.1 billion respirators.  *See* **Exhs. 1, 2**.  ***What 3M has not done in the face of the global COVID-19 pandemic is increase its prices***.  *See id.*

47.    Unfortunately, 3M's sense of civic responsibility during this time of crisis is not universally shared and bad actors are seeking to exploit the increased demand for 3M-branded N95 respirators.  These opportunists advertise and sell counterfeit, damaged, deficient, or otherwise altered versions of 3M's genuine N95 respirators to consumers seeking to protect their health.  In some cases, bad actors advertise 3M-branded N95 respirators without any intention to supply product at all.

48.    To protect both consumers and healthcare workers on the front lines of the COVID-19 battle from deception and inferior products, to reduce time wasted by healthcare providers and procurement officers on scams, as well as to protect 3M's goodwill, reputation, and carefully curated 3M brand, 3M is working diligently with law enforcement, retail partners, and others to combat unethical and unlawful business practices related to 3M-brand N95 respirators.  For example, in late March 2020, 3M's Chief Executive Offer, Mike Roman, sent a letter to U.S. Attorney General, William Barr, and the President of the National Governor's Association, Larry Hogan of Maryland, to offer 3M's partnership in combatting price-gouging.  As shown in the inset image below, additional examples of 3M's efforts to combat price-gouging, counterfeiting, and other unlawful conduct during COVID-19 include:

   a.  3M posted on its website the list price for its 3M-brand N95 respirators so that consumers can readily identify inflated pricing (*See* **Exhibit 3**);

   b.  3M created a form on its website that consumers can use to report suspected incidents of price-gouging and counterfeiting (*See* **Exhibit 5**); and

   c.  3M created a fraud "hotline" that consumers can call to report suspect incidents of price-gouging and counterfeiting.

1

2

3

4



5

6

7

8

9  **E.   Defendants' Unlawful Conduct**

10    49.   Despite 3M's extensive measures to combat price-gouging and prevent

11

12  illicit sales of 3M-brand N95 respirators, bad actors continue to attempt to exploit

13  consumers.   Defendants are prime examples of this unlawful behavior, which

14  jeopardizes public health and safety and risks damaging 3M's brands and reputations.

15

16    50.   On February 24, 2020, Defendants began selling what were purported

17  to be 3M-branded N95 respirators

18  across three connected accounts on

19  Amazon.com.  Defendants maintained

20  at least forty-five (45) different

21  Amazon Standard Identification

22  Numbers (ASINs) used to offer

23  products advertised as being 3M-

24  branded N95 respirators.  A sample of

25  one of Defendants' advertisements of

26  3M-brand respirators, under the seller

27  name "KM BUY," is shown here:

28



51.     Moreover, in an effort to profit from the public's critical need of PPE during the global COVID-19 pandemic, Defendants advertised 3M-branded N95 respirators at a consistently exorbitant price per respirator.  Across all three accounts, the average price per respirator was $23.21.  For reference, this is almost 20 times 3M's posted list price of $1.27 per respirator for the same or comparable products.

52.     To give a detailed example, Defendants made $65,183.42 selling ASIN: B00S04AT4U, titled "3M OHESD 142-8210 Plus 8210Plus Particulate Respirator N95 - Pack of Two Masks," at an average price per respirator of $24.83 (further increased to an average price per respirator of $27.99 when accounting for Defendants' shipping & handling charges).

53.     By contrast, the list price for 3M's 8210Plus N95 respirators is $1.18 - $1.50 per respirator.  *See* **Ex. 3.**

54.     Defendants also routinely misrepresented what would be delivered to purchasers of their unauthorized quantities of purported 3M-branded N95 respirators.  While the ASIN titles indicated that the customers would be purchasing a specific quantity of respirators, customers routinely received fewer than they had paid for.  Numerous complaints were filed with Amazon related to this fraud, including, but not limited to, the following:

a.  **"**The description said ten masks per pack – two packs for $40. What arrived were two (2) masks. I have NO immune system and I wanted more masks.  This is a rip off. I spent $40 for two masks.  I will not let this go – I will report these people.  This is not right. Do not buy from these people – they are lying."

b.  "Today I received this mask. I think this is a fake mask there is no other information like manufacturing details and all. They charged almost $26 including fast track delivery charges. This is useless product."

c.  We expected a box of 10 of the 3M N95 masks. We received 4 masks total.  We paid $24.99 for ONE mask AND $29.92 shipping for a grand total of $129.88.  Yep, we were SCAMMED!"

d. The original post said 10 for $29.99 and I received one in a Ziploc bag . . ."

e. "I think these are fake N95 Mask and seller price gouged me 20 times the retail price.  10 pack of fake N95 mask for $150 is just crooked during this pandemic…"

f. "The seller Cheating in description!! Write 2-packs, but it is only two masks for 80$,. The product also is uncomfortable and doesn't protect from anything! Worst experience!"

55.     Defendants' product listings were intended to defraud, mislead, and/or deceive a reasonable consumer into believing that Defendants are authorized distributors of 3M's products and/or have an association or affiliation with 3M.

56.     By selling and delivering to customers counterfeit, damaged, deficient, or otherwise altered respirators and engaging in price-gouging, Defendants caused irreparable damage to 3M's reputation and its famous 3M Marks.  There is no adequate remedy at law for these injuries.

57.     Based on the foregoing, 3M seeks relief against Defendants for federal and state trademark infringement, trademark counterfeiting, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, and unlawful, unfair, and fraudulent business acts and practices.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Trademark Counterfeiting – 15 U.S.C. §§ 1114(1), 1116(d)

58.     3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

59.     Defendants are using spurious designations that are identical with, or substantially indistinguishable from, the 3M Marks.

60.     Defendants have used these spurious designations in commerce knowing they are counterfeit to advertise, promote, offer for sale, and sell non-3M respirators, including, for example, on their Amazon account pages listing the

DOCUMENT PREPARED
ON RECYCLED PAPER

products that Defendants purportedly have available for sale.

61.     Defendants' use of the spurious designations in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendants and/or Defendants' products originate with, and/or are sponsored or approved by, and/or offered under a license from, 3M.

62.     Based on 3M's longstanding and continuous use of its 3M Marks in United States commerce, as well as the federal registration of the 3M Marks, Defendants had actual and constructive knowledge of 3M's superior rights in and to the 3M Marks when Defendants began using the 3M Marks as part of their bad-faith scheme to confuse and deceive consumers.

63.     Upon information and belief, Defendants adopted and used the 3M Marks in furtherance of Defendants' willful, deliberate, and bad-faith scheme of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

64.     Upon information and belief, Defendants have made, and may continue to make, ill-gotten profits and gain from their unauthorized use of the 3M Marks, to which Defendants are not entitled at law or in equity.

65.     Defendants' acts and conduct complained of herein constitute trademark counterfeiting in violation of 15 U.S.C. §§ 1114(1) and 1116(d).

66.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendants are advertising and offering for sale non-3M respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct invites public criticism of 3M and the manner in which 3M's respirators

are being distributed and sold during the COVID-19 pandemic and creates confusion about 3M's role in the marketplace for respirators essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand.  The acts of Defendants described herein have been willful and in bad faith, making this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

67.    3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## SECOND CLAIM FOR RELIEF

### Trademark Infringement – 15 U.S.C. § 1114(1)

68.    3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

69.    3M is the exclusive owner of each of the federally registered 3M Marks identified herein.

70.    3M's exclusive rights in and to each of the 3M Marks predate any rights that Defendants could establish in and to any mark that consists of "3M" in whole and/or in part.

71.    The 3M Marks are fanciful and/or arbitrary when used for respirators and, therefore, are inherently distinctive.

72.    The 3M Marks have acquired distinctiveness and identify 3M as the exclusive source of products offered under the 3M Marks including, without limitation, 3M-brand N95 respirators.

73.    Defendants are using the 3M Marks in commerce on to advertise, promote, offer for sale, and sell purported 3M-branded N95 respirators, that are counterfeit, damaged, deficient, or otherwise altered.

74.     Defendants' use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about Defendants' affiliation with 3M and the authenticity and origin of the 3M-branded products Defendants are advertising and selling.

75.     3M has not consented to the use of its famous 3M Marks by Defendants.

76.     Based on 3M's longstanding and continuous use of its 3M Marks in United States commerce, as well as the federal registration of the 3M Marks, Defendants had actual and constructive knowledge of 3M's superior rights in and to the 3M Marks when Defendants began using the 3M Marks as part of their bad-faith scheme to confuse and deceive consumers.

77.     Upon information and belief, Defendants adopted and used the 3M Marks in furtherance of Defendants' willful, deliberate, and bad-faith scheme of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

78.     Upon information and belief, Defendants have made, and will continue to make, substantial profits and gain from their unauthorized use of the 3M Marks, to which Defendants are not entitled at law or in equity.

79.     Defendants' acts and conduct complained of herein constitute trademark infringement in violation of 15 U.S.C. § 1114(1).

80.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendants are advertising and offering for sale purported 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect

DOCUMENT PREPARED
ON RECYCLED PAPER

public health.  Such conduct invites public criticism of 3M and the manner in which 3M's N95 respirators are being distributed and sold during the COVID-19 pandemic, and is likely to cause confusion about 3M's role in the marketplace for respirators that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand.

81.    3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

### THIRD CLAIM FOR RELIEF

**Unfair Competition, False Endorsement, False Association, and False Designation of Origin – 15 U.S.C. § 1125(a)(1)(A)**

82.    3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

83.    Defendants advertised what were purported to be 3M-branded products at grossly inflated prices, well above 3M's list prices for 3M brand N95 respirators.

84.    Upon information and belief, and based upon customer feedback regarding Defendants' ASIN listings, Defendants delivered to consumers products that were materially different than legitimate 3M products, including counterfeit, damaged, deficient, or otherwise altered products (*e.g.*, 3M products removed from their original packaging and/or sold without required instructions and labeling information).

85.    Defendants' acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

DOCUMENT PREPARED
ON RECYCLED PAPER

86.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## FOURTH CLAIM FOR RELIEF

### Trademark Dilution – 15 U.S.C. § 1125(c)

87.     3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

88.     The 3M Marks are famous and have been famous at all relevant times. They were famous before and at the time Defendants began using the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators).

89.     Defendants' misuse of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of 3M-branded products that are counterfeit, damaged, deficient or otherwise altered is likely to dilute the distinctive quality of the famous 3M Marks, such that the famous 3M Marks' established selling power and value will be whittled away.

90.     Defendants' misconduct also threatens to harm the reputation of the 3M Marks, constituting dilution by tarnishment of the famous 3M Marks.

91.     Defendants' acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

92.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendants are opportunistically operating their illegal scheme and misrepresentations about 3M-

branded respirators during a global pandemic when those products are essential to safeguard the public health.  Such conduct invites public criticism of 3M and the manner in which 3M's respirators are being distributed and creates a likelihood of confusion about 3M's role in the marketplace for respirators.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand.

93.    3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## FIFTH CLAIM FOR RELIEF

### False Advertising – 15 U.S.C. § 1125(a) et seq.

94.    3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

95.    The statements on Defendants' Amazon product detail pages constitute commercial advertising and/or commercial promotion.

96.    Defendants were involved in interstate commerce because their Amazon product detail pages were accessible nationwide and out-of-state consumers did in fact purchase products from those pages.

97.    The statements on Defendants' Amazon product detail pages contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of 3M and the 3M-brand products, including, without limitation, 3M's branded N95 respirators.

98.    Among these, Defendants advertised, promoted, offered for sale, and sold 3M-branded products (including 3M's branded N95 respirators) that are counterfeit, damaged, deficient, or otherwise altered.  Defendants also made numerous other false representations about the 3M-branded products they advertised and sold including advertising "10 packs" of respirators and delivering

DOCUMENT PREPARED
ON RECYCLED PAPER

1   only one or two respirators for the "10 pack" price.

2        99.   The false, misleading, and/or deceptive statements on Defendants'

3   Amazon product detail pages were material to consumers' purchasing decisions.

4        100.  Defendants' acts constitute willful false statements in connection with

5   goods and/or services distributed in interstate commerce, in violation of section

6   43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

7        101.  The statements on Defendants' Amazon product detail pages have

8   directly and/or proximately caused and/or are likely to cause 3M to suffer

9   irreparable diminution to the 3M brand and 3M Marks' reputation, fame, and

10  goodwill.

11       102.  3M has suffered, and will continue to suffer, irreparable harm from

12  Defendants' acts and conduct complained of herein, unless restrained by law.  3M

13  has been damaged by the acts of Defendants in an amount, currently unknown, to

14  be proved at trial and donated to charitable COVID-19 relief efforts, and 3M

15  requests the relief set forth in the Prayer for Relief below.

16  **SIXTH CLAIM FOR RELIEF**

17  **Price-Gouging and False Advertising in Violation of California Unfair**

18  **Competition Law – Business & Professions Code, § 17200 *et seq.***

19       103.  3M repeats and incorporates by reference the statements and

20  allegations in the preceding paragraphs of the Complaint as though set forth fully

21  herein.

22       104.  On March 4, 2020, California Governor Gavin Newsom declared a

23  state of emergency to exist in California in response to COVID-19.

24       105.  That same day, California Attorney General Xavier Becerra issued a

25  price-gouging alert reminding all Californians that, under Penal Code § 396, price-

26  gouging is illegal in all California communities during the declared state of

27  emergency.

28

DOCUMENT PREPARED
ON RECYCLED PAPER

106.   On March 12, 2020, Governor Newsom issued an executive order further enhancing the ability of the California state and local governments to respond to COVID-19.

107.   On information and belief, Defendants sold or offered to sell consumer goods, emergency supplies, and medical supplies (including, but not limited to, purported 3M's branded N95 respirators) for a price more than 10 percent greater than the price charged by Defendants for those goods prior to the proclamation or declaration of emergency, in violation of Penal Code § 396.

108.   Defendants' violation of Penal Code § 396 constitutes an unlawful business practice and an act of unfair competition within the meaning of California Business & Professions Code § 17200, *et seq.* It is also a crime under California law.

109.   Defendants' unauthorized use in commerce of the 3M Marks is also likely to cause consumer confusion or mistake or to deceive consumers into believing that Defendants' products and/or services are sponsored by, endorsed by, or originate from 3M or are otherwise connected or affiliated with or approved by 3M, thereby causing loss, damage, and injury to 3M and to the purchasing public, constituting unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code 17200, *et seq.*

110.   Defendants' marketing and advertisement of products with the 3M Marks, as alleged herein, was intended to and did mislead 3M's customers and consumers to believe that such products were manufactured or distributed by, or authorized for manufacture or distribution by, 3M, in violation of California Business & Professions Code § 17200, *et seq.*

111.   This conduct, together with Defendants' other acts alleged herein constitute unfair, unlawful, and fraudulent business acts and practices under California Business & Professions Code § 17200, *et seq.*, because such acts are forbidden by various state and federal laws and are unscrupulous, unfair, and

DOCUMENT PREPARED
ON RECYCLED PAPER

injurious to 3M. Defendants' acts have irreparably damaged 3M and the consuming public and will continue to do so unless restrained by this Court, and 3M is without an adequate remedy at law.

112. As a result of Defendants' wrongful conduct, 3M is entitled to, among other relief, an order enjoining and restraining Defendants from diverting, distributing, and selling the 3M-branded products, and 3M is entitled to restoration of any funds that were wrongfully collected by Defendants so that those funds may be donated to charitable COVID-19 relief efforts of 3M's choosing. 3M requests the relief set forth in the Prayer below.

## SEVENTH CLAIM FOR RELIEF

**False Advertising – Business & Professions Code, § 17500 *et seq.***

113. 3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

114. As alleged herein, Defendants have engaged in violations of California Business & Professions Code § 17500, *et seq.* by making or disseminating untrue or misleading statements, with the intent to induce the purchase of 3M-branded N95 respirators. Defendants represented that Defendants were agents of and/or authorized by 3M to sell and/or distribute 3M-branded products when Defendants knew or by the exercise of reasonable care should have known the statements were untrue, misleading, and likely to deceive the reasonable consumer and the public.

115. Defendants engaged in the false and/or misleading advertising and marketing of the 3M-branded N95 respirators, as alleged herein, with the intent to directly or indirectly induce consumers to purchase those respirators.

116. Had Defendants truthfully advertised that they were not authorized to sell 3M-branded products, consumers would not have purchased the products or would have purchased a different product from another manufacturer or distributor.

Document Prepared on Recycled Paper

1   117.   As a direct and proximate result of the aforementioned acts and

2   omissions by Defendants, Defendants received and continues to hold monies

3   rightfully belonging to 3M and that 3M will donate to charitable COVID-19 relief

4   efforts.

5   118.   3M requests the relief set forth in the Prayer below.

6   ## EIGHTH CLAIM FOR RELIEF

7   ### Common Law Unfair Competition

8   119.   3M repeats and incorporates by reference the statements and

9   allegations in the preceding paragraphs of the Complaint as though set forth fully

10  herein.

11  120.   Defendants' acts and conduct complained of herein constitute unfair

12  competition in violation of California common law.

13  121.   3M has suffered, and will continue to suffer, irreparable harm from

14  Defendants' acts and conduct complained of herein, unless restrained by law.

15  122.   3M has been damaged by the acts of Defendants in an amount,

16  currently unknown, to be proved at trial and donated to charitable COVID-19 relief

17  efforts, and 3M requests the relief set forth in the Prayer below.

18  ## PRAYER FOR RELIEF

19  **WHEREFORE**, based on Defendants' conduct complained of herein, 3M

20  asks this Court:

21  A.   To enter an Order, finding in 3M's favor on each Claim for Relief

22  asserted herein;

23  B.   For Claims One through Five under the Lanham Act for federal

24  trademark counterfeiting, federal trademark infringement, unfair competition, false

25  endorsement, false association, and false designation of origin, trademark dilution,

26  and false advertising:

27  1.   Pursuant to 15 U.S.C. § 1116:

28

(i) To permanently enjoin Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them from misusing the 3M Marks (or any other mark(s) confusingly similar thereto) for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, 3M-brand N95 respirator Marks, including but not limited to (A) using the 3M Marks to identify counterfeit products or products which materially differ from genuine 3M products; (B) using the 3M Marks in a way that mispresents Defendants' relationship with 3M or 3M's relationship with the products being offered by Defendants; (C) using the 3M Marks in way which dilutes their distinctive quality or tarnishes 3M's reputation; and (D) using more of the 3M Marks than is necessary to identify the products being offered (such as use of the 3M logo in product listings and advertising other than in photos of the logo as it appears on 3M packaging for genuine 3M products being offered for sale);

(ii) To permanently enjoin Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them from falsely representing themselves as being distributors, authorized retailers, and/or licensees of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators) and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products;

DOCUMENT PREPARED
ON RECYCLED PAPER

    (iii)  To permanently enjoin Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them from misrepresenting the quality, nature or characteristics of 3M products being offered;

    (iv)  To order Defendants to file with the Court and serve upon 3M's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

2.     Pursuant to 15 U.S.C. § 1117:

    (i)  To order Defendants to provide 3M with a full accounting of all manufacture, distribution and sale of products under the 3M Marks (including, without limitation, 3M-brand N95 respirators), as well as all profits derived therefrom;

    (ii)  To order Defendants to pay to 3M—so as to be donated charitably—all of Defendants' profits derived from the sale of infringing goods offered under the 3M Marks (including, without limitation, 3M-brand N95 respirators) or, in the alternative, statutory damages of $2,000,000 for the willful use of a counterfeit mark, per counterfeit mark per type of goods infringed, pursuant to §1117(c)(2);

    (iii)  To find that Defendants' acts and conduct complained of herein render this case "exceptional";

    (iv)  To award 3M—so as to be donated charitably—treble damages in connection with Defendants' activities;

    (v)  To award 3M reasonable attorneys' fees pursuant to §1117(a)-(b); and

Document Prepared
on Recycled Paper

1        (vi)  To award 3M the costs of this action and pre-judgment and

2               post-judgment interest.

3        3.     Pursuant to 15 U.S.C. § 1118, to order the destruction of all

4 unauthorized goods and materials within the possession, custody, and control of

5 Defendants that bear, feature, and/or contain any copy or colorable imitation of

6 3M's Marks.

7        C.     For Claims Six, Seven, and Eight, to issue an order permanently

8 enjoining Defendants, their officers, agents, representatives, servants, employees,

9 successors and assigns, and all others in active participation with them from

10 engaging in conduct involving the advertisement or sale of 3M-branded products as

11 described above, to award 3M restitution in the form of disgorgement of profits

12 earned by Defendants in unlawfully selling 3M products, and to award Defendants

13 their attorneys' fees, costs, and expenses pursuant to Cal. C.C.P. § 1021.5, with all

14 such monetary relief to be donated to charitable COVID-19 relief efforts.

15        D.     To award 3M such other relief that the Court deems just and equitable.

16                    **DEMAND FOR JURY TRIAL**

17        3M requests a trial by jury for all issues so triable pursuant to FED. R. CIV. P.

18 38(b) and 38(c).

19 DATED this 8th day of June 2020.

20                       NORTON ROSE FULBRIGHT US LLP

21                       By:  _/ s/ Kevin Mayer_____

22                       Kevin Mayer
                               555 South Flower Street

23                       Forty-First Floor
                               Los Angeles, CA 90071

24

25                       Christopher Weimer (*pro hac vice forthcoming*)
                               PIRKEY BARBER PLLC

26                       1801 East 6th Street, Suite 300
                               Austin, Texas 78702

27

28                       Attorneys for Plaintiff 3M COMPANY

# Exhibit 1

Published on *3M News / United States* (https://news.3m.com) on 4/6/20 5:58 pm CDT

# 3M and the Trump Administration Announce Plan to Import 166.5 Million Additional Respirators into the United States over the Next Three Months

**Release Date:**
Monday, April 6, 2020 5:58 pm CDT

**Terms:**
 Company (English)

**Dateline City:**
ST. PAUL, Minn.

## *Imports to supplement the 35 million N95 respirators 3M currently produces in U.S. per month*

ST. PAUL, Minn.--(BUSINESS WIRE)--Today 3M and the Trump Administration are announcing a plan to import 166.5 million respirators over the next three months to support healthcare workers in the United States. 3M and the Administration worked together to ensure that this plan does not create further humanitarian implications for countries currently fighting the COVID-19 outbreak, and committed to further collaborate to fight price gouging and counterfeiting.

"I want to thank President Trump and the Administration for their leadership and collaboration," said 3M chairman and CEO Mike Roman. "We share the same goals of providing much-needed respirators to Americans across our country and combating criminals who seek to take advantage of the current crisis. These imports will supplement the 35 million N95 respirators we currently produce per month in the United States."

"Given the reality that demand for respirators outpaces supply, we are working around the clock to further expand our capacity, while prioritizing and redirecting our supplies to serve the most critical areas," Roman continued. "We'll continue to do all we can to protect our heroic healthcare workers and first responders, and I want to thank our 96,000 3Mers for your tireless efforts – including those in our plants and distribution centers around the world."

3M will import 166.5 million respirators over the next three months primarily from its manufacturing facility in China, starting in April. The Administration is committed to working to address and remove export and regulatory restrictions to enable this plan. The plan will also enable 3M to continue sending U.S. produced respirators to Canada and Latin America, where 3M is the primary source of supply.

As a global company, 3M has manufacturing operations around the world to serve local and regional markets. As the pandemic unfolds in different stages around the world, 3M will continue to work with governments to direct respirators and other supplies to serve areas most in need.

Beginning in January, 3M ramped up production of N95 respirators and doubled its global output to 1.1 billion per year – including the 35 million a month in the United States. 3M has already put into motion additional investments and actions that will enable it to double its capacity again to 2 billion globally within 12 months, with additional capacity to begin coming online in the next 60 to 90 days. In the United States, for example, 3M expects to be producing N95 respirators at a rate of 50 million per month in June, a 40 percent increase from current levels.

Last week 3M announced additional actions to address price gouging and counterfeit activity related to its respirators. 3M has not changed the prices it charges for respirators, and will take decisive action against those seeking to take illegal and unethical advantage of the COVID-19 outbreak.

**Forward-Looking Statements**
This news release contains forward-looking information about 3M's financial results and estimates and business prospects that involve substantial risks and uncertainties. You can identify these statements by the use of words such as "anticipate," "estimate," "expect," "aim," "project," "intend," "plan," "believe," "will," "should," "could," "target," "forecast" and other words and terms of similar meaning in connection with any discussion of future operating or financial performance or business plans or prospects. Among the factors that could cause actual results to differ materially are the following: (1) worldwide economic, political, regulatory, capital markets and other external conditions and other factors beyond the Company's control, including natural and other disasters or climate change affecting the operations of the Company or its customers and suppliers; (2) risks related to public health crises such as the global pandemic associated with the coronavirus (COVID-19); (3) liabilities related to certain fluorochemicals, including lawsuits concerning various PFAS-related products and chemistries, and claims and governmental regulatory proceedings and inquiries related to PFAS in a variety of jurisdictions; (4) legal proceedings, including significant developments that could occur in the legal and regulatory proceedings described in the Company's Annual Report on Form 10-K for the year ended Dec. 31, 2019, and any subsequent quarterly reports on Form 10-Q (the "Reports"); (5) competitive conditions and customer preferences; (6) foreign currency exchange rates and fluctuations in those rates; (7) the timing and market acceptance of new product offerings; (8) the availability and cost of purchased components, compounds, raw materials and energy (including oil and natural gas and their derivatives) due to shortages, increased demand or supply interruptions (including those caused by natural and other disasters and other

events); (9) unanticipated problems or delays with the phased implementation of a global enterprise resource planning (ERP) system, or security breaches and other disruptions to the Company's information technology infrastructure; (10) the impact of acquisitions, strategic alliances, divestitures, and other unusual events resulting from portfolio management actions and other evolving business strategies, and possible organizational restructuring; (11) operational execution, including scenarios where the Company generates fewer productivity improvements than estimated; (12) financial market risks that may affect the Company's funding obligations under defined benefit pension and postretirement plans; and (13) the Company's credit ratings and its cost of capital. Changes in such assumptions or factors could produce significantly different results. A further description of these factors is located in the Reports under "Cautionary Note Concerning Factors That May Affect Future Results" and "Risk Factors" in Part I, Items 1 and 1A (Annual Report) and in Part I, Item 2 and Part II, Item 1A (Quarterly Reports), as updated by applicable Current Reports on Form 8-K. The information contained in this news release is as of the date indicated. The Company assumes no obligation to update any forward-looking statements contained in this news release as a result of new information or future events or developments.

About 3M
At 3M, we apply science in collaborative ways to improve lives daily. With $32 billion in sales, our 96,000 employees connect with customers all around the world. Learn more about 3M's creative solutions to the world's problems at www.3M.com or on Twitter @3M or @3MNews.

**Language:**
English

**Contact:**

Jennifer Ehrlich
651-733-8805

**Ticker Slug:**
*Ticker:* MMM
*Exchange:* NYSE

---

**Source URL:** https://news.3m.com/press-release/company-english/3m-and-trump-administration-announce-plan-import-1665-million-addition

# Exhibit 2



**PRODUCTS FOR**    ▼    **PRODUCTS FOR**    ▷    **ABOUT US** ▷
**BUSINESS**              **CONSUMERS**

3M United States > Coronavirus



# Helping the world respond to COVID-19

## 3M is committed to doing everything we can to fight COVID-19 and support healthcare workers globally

The COVID-19 pandemic continues to affect all of us, and 3M is working around-the-clock to help provide critical tools for the fight. Our current focus: supporting healthcare and front-line workers around the world by manufacturing products they need to help protect their lives as they treat others.

4/9/2020                                    2019 Coronavirus (COVID-19) | 3M Protective Information



## Increasing output of N95 respirators

Doubled our global output rate to nearly 100 million respirators per month; expect to produce about 50 million respirators per month in the U.S. by June 2020.

Anticipate doubling our global capacity to almost 2 billion respirators in the next 12 months.

We have not increased the **prices we charge for 3M respirators** in this crisis.



## Partnering with others to supply more

Working with governments to investigate alternate manufacturing scenarios and exploring coalitions with other companies to increase capacity further.

Partnering with Ford Motor Company to increase production of 3M Powered Air Purifying Respirators.

Secured authorization from the Chinese government to import about 10 million masks to the US from our manufacturing facility in China.



## Getting product to those who need it most

In the last seven days of March 2020, we sent 10 million N95 respirators to healthcare facilities across the U.S.

In the US, 90% of our N95 respirators designated for healthcare workers; remainder for critical industries including: food, energy and pharmaceutical.

Maximizing production of other important products, including hand sanitizers and disinfectants.



## Combatting price-gouging, fraud and counterfeiting

Working with law enforcement, retail partners and others to identify unethical, illegal counterfeiters and price-gougers related to 3M's respirators, remove them from e-commerce partner sites, and refer them to the appropriate law enforcement authorities.

Inviting those with concerns of potentially fraudulent activity, price gouging, or counterfeit 3M products **to report their concerns at 3M's website** so we can take action.

 

## WARNING: Fraud and Counterfeit Activity

We have created a new 3M hotline for the U.S. and Canada that
end-users and purchasers of 3M products can call for information
on how to identify authentic 3M products and to ensure products
are from 3M authorized distributors.



**1 (800) 426-8688**
Call the fraud hotline.

**Report a concern**

**STATEMENT: Fraudulent Activity, Price Gouging, and Counterfeit
Products**
(PDF, 1.8 MB)

3M recommends purchasing our products from a 3M authorized distributor or dealer
only. This offers the greatest assurance that you will receive authentic 3M product.

If you need help identifying 3M authorized distributors and dealers in your area, please
contact **3M Help Center** or 1 (888) 364-3577 in the United States. In Canada, please
contact **3M Canada Customer Service** at 1 (800) 364-3577.

# Learn about critical 3M products and
access helpful resources

- 36 -

  

## Personal Protective Equipment (PPE)

Proper selection and use are key to utilizing respirators to help reduce exposure to airborne contaminants. Find Technical Bulletins, How to Videos, Fit Testing Resources and more information to help you protect your employees and yourself.

**Learn more about personal protective equipment**

## Commercial Cleaning Solutions

Get information and application tips on 3M cleaning and disinfectant products for use by facility managers, building service contractors and all who clean public spaces.

**Learn more about commercial cleaning solutions**

## Supporting Health Care Providers

Every day, health care workers on the front lines put themselves at risk to ensure others are cared for. 3M Medical offers resources and information to help protect providers and patients, especially during this challenging time.

**Learn more about health care provider resources**

# Stay up to date with 3M's response to COVID-19





April 01, 2020

## Putting healthcare workers first during the coronavirus outbreak

- 38 -





March 31, 2020



READ MORE IN THE 3M NEWS CENTER

## Stay up-to-date on the science of COVID-19

If you have questions about the virus and how to best protect yourself, please consult the sources below for the most current guidelines and recommended precautions.





## Center for Disease Control and Prevention

- **2020 Situation Summary**
- **What You Need to Know**
- **Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings**

## World Health Organization

- **Coronavirus**
- **Infection prevention and control during health care when novel coronavirus (nCoV) infection is suspected**

## Contact Media Relations

Media inquiries regarding 3M's response to the coronavirus situation should be referred to 3M Media Relations.

**Contact Us**

# Exhibit 3



**May 18, 2020**

## Fraudulent Activity, Price Gouging, and Counterfeit Products

At 3M, we are committed to doing all we can to help combat the fraudulent, price gouging, and counterfeit activity that is unfortunately occurring in connection with COVID-19. Examples include people fraudulently representing themselves as being affiliated with 3M and having authentic 3M product to sell, selling (or offering to sell) 3M products at grossly inflated prices, selling counterfeit products falsely claimed to be from 3M, and falsely claiming to manufacture 3M products. In many cases, these scammers will try and secure funds in advance and then disappear once the money is received.

3M will not tolerate any such activity by 3M authorized channel partners and we will aggressively pursue third-parties that seek to take advantage of this crisis. We are working with law enforcement authorities around the world – including, in the U.S., the U.S. Attorney General, state Attorneys General, and local authorities.

We have also created a new **3M COVID-19 Fraud hotline** for the U.S. and Canada that end-users and purchasers of 3M products can call for information to help detect fraud and avoid counterfeit products. **You can reach this hotline by calling: 1 (800) 426-8688.**

In addition to the hotline, you can report a concern in the US at **www.go.3m.com/covidfraud**. You can report a concern in Canada at **www.go.3M.com/covidfraud-en-ca** (English) or **www.go.3M.com/covidfraud-fr-ca** (French)

3M recommends purchasing our products only from a 3M authorized distributor or dealer, as that offers the greatest assurance that you will receive authentic 3M products.

**With regard to 3M respirators specifically, we are providing the following additional information to help stop price gouging and sales of counterfeit products:**

- 3M has <u>not</u> changed the prices we charge for 3M respirators as a result of the COVID-19 outbreak.

- We are actively working to eliminate price gouging, including making referrals to law enforcement where appropriate.

- To help customers identify and avoid inflated prices, we are now publishing current single-case list prices for many of the most common 3M N95 respirator models sold in the U.S.

- List prices for these models sold in Canada are similar on a currency-adjusted basis.

- These list prices are per respirator.

|  | Model # | List Price (USD) |
|---|---|---|
| **Surgical N95 Respirators** | 1804 | $0.68 |
|  | 1804S | $0.68 |
|  | 1860 | $1.27 |
|  | 1860S | $1.27 |
|  | 1870+ | $1.78 |
| **Standard N95 Respirators** | 8210 | $1.02 - $1.31 |
|  | 8210Plus | $1.18 - $1.50 |
|  | 8210V | $1.48 - $1.88 |
|  | 8110S | $1.08 - $1.37 |
|  | 8200 | $0.63 - $0.80 |
|  | 8511 | $2.45 - $3.11 |
|  | 9105 | $0.64 - $0.81 |
|  | 9105S | $0.64 - $0.81 |
|  | 9210+ | $1.40 - $1.78 |
|  | 9211+ | $2.68 - $3.40 |

- Actual prices may be lower than these list prices, as negotiated between you and your chosen reseller.

- 3M has also worked to further accelerate delivery of respirators to critical end-users – both by utilizing our existing network of healthcare distributors and, where it makes sense to do so, shipping directly to end-user locations. Effective the week of March 23, the small volume of 3M filtering facepiece respirators being made available to critical industrial infrastructure is shipping directly to the specified end-user.

- 3M respirators should be sold only in 3M packaging, with model-specific user instructions accompanying the product.

- 3M respirators should not be sold individually or without packaging (including User Instructions).

- 3M has strict quality standards, and therefore products that have missing straps, strange odors, blocked valves, misspelled words, etc. are likely not authentic 3M respirators.

Finally, 3M personal protective equipment (PPE) is intended, labeled, packaged, and certified to meet the requirements of the countries in which 3M sells it. Those requirements differ around the world, including as it relates to, for example, respirator performance, local language, and local certification and approval for sale and use. As a result, 3M PPE imported from other countries may not meet local requirements. Please confirm such PPE meets all applicable requirements prior to use.

For technical assistance regarding the selection and use of 3M respirators, please contact your local 3M Technical Service team. In the U.S., you can call 1 (800) 243-4630. In Canada, you can call 1 (800) 364-3577.

**For more information, contact the 3M Help Center at 1 (888) 364-3577 in the United States. In Canada, please contact 3M Canada Customer Service at 1 (800) 364-3577.**

3M Company
3M Center
St. Paul, MN
55144-1000

© 3M 2020. All Rights Reserved.
3M is a trademark of 3M Company and affiliates.
Used under license in Canada.

# Exhibit 4

Int. Cls.: 9 and 10

Prior U.S. Cls.: 21, 23, 26, 36, 38, 39 and 44

United States Patent and Trademark Office

Reg. No. 3,398,329
Registered Mar. 18, 2008

## TRADEMARK
### PRINCIPAL REGISTER

# 3M

3M COMPANY (DELAWARE CORPORATION)
3M CENTER, 220-9E-01
2501 HUDSON ROAD
ST. PAUL, MN 55144

FOR: FULL LINE OF PARTICULATE, OZONE, GAS, VAPOR, CHEMICAL, BIOHAZARD AND OTHER RESPIRATORS, INCLUDING FILTERING FACE-PIECE RESPIRATORS AND ELASTOMERIC FACE-PIECE RESPIRATORS, OTHER THAN FOR ARTIFICIAL RESPIRATION; FULL LINE OF SELF-RESCUE AND PROTECTION APPARATUS, NAMELY, OXYGEN BREATHING UNITS, SUPPLIED-AIR RESPIRATORS, AND POWERED AIR-PURIFYING SYSTEMS (PAPRS) RESPIRATORS; CARTRIDGES, FILTERS, AIR TANKS AND OTHER COMPONENT PARTS FOR RESPIRATORS AND BREATHING UNITS; DUST MASKS; FULL LINE OF PROTECTIVE EYEWEAR, NAMELY, SAFETY GOGGLES, EYEGLASSES AND EYE SHIELDS; FACE-PROTECTION SHIELDS; EAR PLUGS AND EAR MUFFS TO ATTENUATE SOUND AND PROTECT HEARING; HARD HATS AND OTHER PROTECTIVE HELMETS; WELDING HELMETS; AIR MONITORING DEVICES AND SENSORS FOR MEASURING GASES AND VAPOR CONCENTRATION LEVELS; GAS DETECTORS FOR DETECTING THE PRESENCE OF CARBON MONOXIDE AND OTHER GASES; THERMAL-IMAGING CAMERAS FOR USE BY FIREFIGHTERS AND FOR SEARCH AND RESCUE; ENVIRONMENTAL SAMPLING AND TESTING INSTRUMENTS AND EQUIPMENT, NAMELY, ELECTRONIC LUMINOMETERS, AND RELATED SOFTWARE, DOCKING STATIONS AND BATTERIES, FOR DETECTING, MEASURING AND ANALYZING CHEMICALS, BIOLOGICAL SUBSTANCES, FOOD RESIDUES AND MICROBES; MICROBIOLOGICAL AND CONTAMINANT-TESTING INSTRUMENTS AND EQUIPMENT, AND SOFTWARE RELATED THERETO, FOR DETECTING, MEASURING AND ANALYZING BACTERIA, INCLUDING PATHOGENS SUCH SALMONELLA AND LISTERIA, ALLERGENS, TOXINS, VITAMINS,

ANTIBIOTICS, AND OTHER ORGANISMS AND SUBSTANCES; DIAGNOSTIC APPARATUS FOR TESTING FOOD; LABORATORY EQUIPMENT AND SUPPLIES, NAMELY, TEST TUBES, TEST TUBE CAPS, DIP STICKS, RACKS, MICROTITRE PLATES AND TRAYS; SECURITY SCANNERS AND READERS FOR USE IN READING PASSPORTS AND OTHER FORMS OF IDENTIFICATION; ANTI-THEFT AND LIBRARY MATERIAL CHECK-OUT SECURITY SYSTEMS; RADIO FREQUENCY IDENTIFICATION (RFID) TAGS AND READERS; COMPUTER SOFTWARE FOR SUPPLY CHAIN MANAGEMENT FROM SOURCE TO CONSUMPTION, NAMELY, FOR COLLECTING, STORING AND MANAGING DATA, AND REPORTING, EXECUTING AND TRACKING, IN CONNECTION WITH ENTERPRISE RESOURCE PLANNING, SUPPLIER ENABLEMENT, MANUFACTURING, INVENTORY CONTROL AND WAREHOUSING, ORDER FULFILLMENT, SHIPPING, TRANSPORTATION AND DELIVERY; COMPUTER SOFTWARE FOR USE IN THE MEDICAL AND HEALTH CARE FIELDS FOR PROCESSING CLAIMS FOR REIMBURSEMENT, MAINTAINING PATIENT AND MEDICAL RECORDS, CODING AND GROUPING DATA USED FOR MEDICAL AND HEALTH CARE RESEARCH, AND FOR REPORTING HEALTH TRENDS AND OTHER MEDICAL DATA; AND MEDICAL IMAGING SCANNERS AND RELATED SOFTWARE FOR CAPTURING IMAGES OF THE MOUTH AND TEETH FOR USE IN DENTISTRY, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 0-0-1960; IN COMMERCE 0-0-1960.

FOR: FULL LINE OF SURGICAL AND MEDICAL MASKS, RESPIRATORS AND FACE AND EYE SHIELDS FOR MEDICAL AND HEALTH-CARE RELATED PERSONNEL; FULL LINE OF ORTHOPEDIC CASTINGS TAPES, SPLINTS, REINFORCING STRIPS, ELASTIC BANDAGES, AND SUPPORT BANDAGES AND COMPRESSION WRAPS; COMPOSITE FABRICS CONTAINING FIBERGLASS

AND RESINS FOR USE IN MAKING CASTS; PADDING FOR ORTHOPEDIC CASTS; ORTHOPEDIC CASTING TOOLS; FULL LINE OF STETHOSCOPES; FULL LINE OF SURGICAL MASKS, FACE SHIELDS, AND RESPIRATORY MASKS FOR MEDICAL PURPOSES; FULL LINE OF SURGICAL AND MEDICAL PROCEDURE DRAPES AND SHEETS; PATIENT ISOLATION DRAPES; MEDICAL-EQUIPMENT ISOLATION DRAPES; NON-ADHERENT SHEETING FOR BEDS, STRETCHERS AND EXAM TABLES; SURGICAL GOWNS; COMPRESSION BANDAGES; SURGICAL COMPRESSES; MEDICAL THERMOMETERS; FULL LINE OF MEDICAL ELECTRODES WITH OR WITHOUT CHEMICAL CONDUCTORS AND WET GELS FOR USE IN CARDIAC, ELECTROCARDIOGRAPH, ELECTRO-ENCEPHALOGRAPH AND OTHER TYPES OF PATIENT MONITORING; LEADS AND CONNECTORS FOR USE WITH MEDICAL ELECTRODES; DEFIBRILLATION PADS; ELECTROSURGICAL PADS, PLATES AND ADAPTERS TO REMOVE RF CURRENT FROM A PATIENT'S BODY DURING ELECTROSURGERY; THERMAL COLD AND HOT PACKS FOR FIRST AID AND THERAPEUTIC PURPOSES; EYE PATCHES FOR MEDICAL USE; PADDING FOR USE BETWEEN MEDICAL EQUIPMENT AND PATIENTS OR FOR ELEVATING OR POSITIONING LIMBS; POUCHES FOR HOLDING SURGICAL AND MEDICAL INSTRUMENTS; ISOLATION POUCHES AND BAGS FOR STORING ORGANS, TISSUE AND OTHER BODY PARTS FOR TRANSPLANTS AND LABORATORY TESTING; FULL LINE OF STERILIZED AND NON-STERILIZED FASTENING AND COMPRESSION SURGICAL WRAPS; AUTOCLAVES FOR MEDICAL USE; ORTHODONTIC APPLIANCES; DENTAL APPARATUS, NAMELY, INTRA-ORAL LIGHT SYSTEMS FOR CURING DENTAL MATERIALS, CERAMIC USED IN MAKING DENTAL CROWNS, BRIDGES AND OTHER RESTORATIVES; DENTAL INSTRUMENTS AND KITS COMPRISED OF SUCH INSTRUMENTS, NAMELY, MANDRELS, BURS, DISCS, CUPS, WHEELS, POINTS, BRUSHES AND ABRASIVE STRIPS USED TO GRIND, POLISH OR FINISH DENTAL RESTORATIVES; DENTAL INSTRUMENTS, NAMELY, SCISSORS, CRIMPING PLIERS, CONTOURING PLIERS AND IMPRESSION TRAYS; ELECTRONIC MIXERS FOR DENTAL COMPOUNDS; APPLICATORS AND DISPENSERS FOR DENTAL PRIMERS, CEMENTS, ADHESIVES, IMPRESSION MATERIALS AND RESTORATIVE MATERIALS; GLASS-FIBER POSTS USED IN DENTAL RESTORATIVE PROCEDURES; AND DENTAL PROPHYLAXIS ANGLES AND DENTAL PROPHYLAXIS CUPS FOR USE IN CLEANING TEETH AND DENTAL HYGIENE PROCEDURES, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 0-0-1960; IN COMMERCE 0-0-1960.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 1,237,168, 2,793,534 AND OTHERS.

SER. NO. 77-257,496, FILED 8-16-2007.

TARAH HARDY, EXAMINING ATTORNEY

Int. Cls.: 1, 3, 5, 9, 10 and 28

Prior U.S. Cls.: 1, 4, 5, 6, 10, 18, 21, 22, 23, 26, 36, 38, 39, 44, 46, 50, 51 and 52

Reg. No. 2,692,036

## United States Patent and Trademark Office

Registered Mar. 4, 2003

## TRADEMARK
### PRINCIPAL REGISTER



3M COMPANY (DELAWARE CORPORATION)
2501 HUDSON ROAD
3M CENTER
ST. PAUL, MN 55144 , BY MERGER, BY CHANGE OF NAME MINNESOTA MINING AND MANUFACTURING COMPANY (DELAWARE CORPORATION) ST. PAUL, MN 55144

FOR: ETHYLENE OXIDE FOR USE IN THE STERILIZATION OF MEDICAL, LABORATORY AND FOOD HANDLING INSTRUMENTS AND EQUIPMENT; CHEMICAL AND STEAM INDICATOR STRIPS AND TAPE FOR USE WITH AUTOCLAVES AND FOR TESTING THE STERILITY OF MEDICAL INSTRUMENTS AND EQUIPMENT; INDICATOR STRIPS FOR TESTING GLUTARALDEHYDE, ETHYLENE OXIDE AND OTHER CHEMICAL SOLUTIONS AND GASES; INDICATOR STRIPS FOR TESTING FOR BIOLOGICAL CONDITIONS FOR USE IN SAFETY-MONITORING; INDICATOR STRIPS FOR INDICATING TEMPERATURES FOR USE IN THE STERILIZATION AND SAFETY-MONITORING; ASSAY AND REAGENT TEST KITS AND COUNT PLATES FOR FIELD AND LABORATORY TESTING FOR E COLI, COLIFORM, AND OTHER BACTERIA OR CONTAMINANTS IN MEAT, DAIRY PRODUCTS AND OTHER TYPES OF FOOD, AND FOR TESTING TO DETECT YEAST AND MOLD; AND STERILIZATION MONITOR TESTING KITS CONTAINING INDICATOR STRIPS OR TAPE, REAGENTS AND RECORD KEEPING CARDS OR BINDERS FOR TESTING THE STERILITY OF SURGICAL AND MEDICAL INSTRUMENTS, EQUIPMENT, AND SUPPLIES , IN CLASS 1 (U.S. CLS. 1, 5, 6, 10, 26 AND 46).

FIRST USE 11-0-1990; IN COMMERCE 11-0-1990.

FOR: NON-MEDICATED SKIN CARE PRODUCTS, NAMELY, CLEANSERS, CREAMS, LOTIONS, MOISTURIZERS, BARRIER CREAMS AND EMOLLIENTS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 1-0-1996; IN COMMERCE 1-0-1996.

FOR: FULL LINE OF BANDAGES, DRESSINGS AND MEDICAL TAPES, NAMELY, ADHESIVE BANDAGES, BANDAGES FOR SKIN WOUNDS, SURGICAL BANDAGES, WOUND DRESSINGS, NON-STICK PADS FOR USE AS MEDICAL DRESSINGS, MEDICATED COMPRESSES, TRANSPARENT MEDICAL DRESSINGS, HYDROCOLLOID DRESSINGS, COLOSTOMY DRESSINGS, ULCER DRESSINGS, MEDICAL ADHESIVE TAPES, SURGICAL TAPES, AND WOUND AND SKIN CLOSURE ADHESIVE STRIPS WITH OR WITHOUT ANTIMICROBIAL SOLUTIONS; GAUZE; WOUND HEALING FILLERS WITH OR WITHOUT GAUZE; MEDICATED SKIN CARE PREPARATIONS; SURGICAL DISINFECTANTS AND PREPPING SOLUTIONS; MEDICATED ANTISEPTIC HAND WASHES; AND CULTURE MEDIA, BACTERIOLOGICAL MEDIA AND DIAGNOSTIC PREPARATIONS FOR CLINICAL OR MEDICAL LABORATORY USE, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 2-0-1991; IN COMMERCE 2-0-1991.

FOR: COMPUTER SOFTWARE FOR USE IN THE MEDICAL AND HEALTH CARE FIELDS FOR PROCESSING CLAIMS FOR REIMBURSEMENT, MAINTAINING PATIENT RECORDS, CODING AND GROUPING DATA USED FOR MEDICAL AND HEALTH CARE RESEARCH, AND FOR REPORTING HEALTH TRENDS AND OTHER MEDICAL DATA; AND FULL LINE OF RESPIRATORY FACE MASKS FOR FILTERING OUT GERMS, DUST AND POLLEN, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 5-0-1992; IN COMMERCE 5-0-1992.

FOR: FULL LINE OF ORTHOPEDIC CASTINGS TAPES, SPLINTS, REINFORCING STRIPS, ELASTIC BANDAGES, AND SUPPORT BANDAGES AND COMPRESSION WRAPS; COMPOSITE FABRICS CONTAINING FIBERGLASS AND RESINS FOR USE IN MAKING CASTS; PADDING FOR ORTHOPEDIC CASTS; ORTHOPEDIC CASTING TOOLS; FULL LINE OF STETHOSCOPES; FULL LINE OF SURGICAL MASKS, FACE SHIELDS, AND RESPIRATORY MASKS FOR MEDICAL PURPOSES; FULL LINES OF SURGICAL AND MEDICAL PROCEDURE DRAPES AND SHEETS; PATIENT ISOLATION DRAPES; MEDICAL-EQUIPMENT ISOLATION DRAPES; NON-ADHERENT SHEETING FOR BEDS, STRETCHERS AND EXAM TABLES; SURGICAL GOWNS; COMPRESSION BANDAGES; SURGICAL COMPRESSES; MEDICAL THERMOMETERS; FULL LINE OF MEDICAL ELECTRODES WITH OR WITHOUT CHEMICAL CONDUCTORS AND WET GELS FOR USE IN CARDIAC, ELECTROCARDIOGRAPH, ELECTROENCEPHALOGRAPH AND OTHER TYPES OF PA-

TIENT MONITORING; LEADS AND CONNECTORS FOR USE WITH MEDICAL ELECTRODES; DEFIBRILLATION PADS; ELECTROSURGICAL PADS, PLATES AND ADAPTERS TO REMOVE RF CURRENT FROM A PATIENT'S BODY DURING ELECTROSURGERY; THERMAL COLD AND HOT PACKS FOR FIRST AID AND THERAPEUTIC PURPOSES; EYE PATCHES FOR MEDICAL USE; PADDING FOR USE BETWEEN MEDICAL EQUIPMENT AND PATIENTS OR FOR ELEVATING OR POSITIONING LIMBS; POUCHES FOR HOLDING SURGICAL AND MEDICAL INSTRUMENTS; ISOLATION POUCHES AND BAGS FOR STORING ORGANS, TISSUE AND OTHER BODY PARTS FOR TRANSPLANTS AND LABORATORY TESTING; AND FULL LINE OF STERILIZED AND NON-STERILIZED FASTENING AND COMPRESSION SURGICAL WRAPS, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 6-0-1990; IN COMMERCE 6-0-1990.

FOR: ATHLETIC TAPE AND ATHLETIC SUPPORT AND COMPRESSION WRAPS FOR KNEES, WRISTS, ANKLES, ELBOWS, LEGS AND ARMS, IN CLASS 28 (U.S. CLS. 22, 23, 38 AND 50).

FIRST USE 0-0-1993; IN COMMERCE 0-0-1993.

OWNER OF U.S. REG. NOS. 1,181,981, 1,213,836, AND 1,234,260.

SER. NO. 76-137,885, FILED 9-29-2000.

ALICIA COLLINS, EXAMINING ATTORNEY

Int. Cls.: 1, 3, 5, 9, 10 and 28

Prior U.S. Cls.: 1, 4, 5, 6, 10, 18, 21, 22, 23, 26, 36, 38, 39, 44, 46, 50, 51 and 52

## United States Patent and Trademark Office

Reg. No. 2,793,534
Registered Dec. 16, 2003

## TRADEMARK
### PRINCIPAL REGISTER



3M COMPANY (DELAWARE CORPORATION)
2501 HUDSON ROAD
3M CENTER
ST. PAUL, MN 55144 , BY MERGER, BY CHANGE OF NAME MINNESOTA MINING AND MANU-FACTURING COMPANY (DELAWARE COR-PORATION) ST. PAUL, MN 55144

FOR: ETHYLENE OXIDE FOR USE IN THE STERILIZATION OF MEDICAL, LABORATORY AND FOOD HANDLING INSTRUMENTS AND EQUIPMENT; CHEMICAL AND STEAM INDICA-TOR STRIPS AND TAPE FOR USE WITH AUTO-CLAVES AND FOR TESTING THE STERILITY OF MEDICAL INSTRUMENTS AND EQUIPMENT; IN-DICATOR STRIPS FOR TESTING GLUTARALDE-HYDE, ETHYLENE OXIDE AND OTHER CHEMICAL SOLUTIONS AND GASES; INDICATOR STRIPS FOR TESTING FOR BIOLOGICAL CONDI-TIONS FOR USE IN SAFETY-MONITORING; INDI-CATOR STRIPS FOR INDICATING TEMPERATURES FOR USE IN THE STERILIZA-TION AND SAFETY-MONITORING; ASSAY AND REAGENT TEST KITS AND COUNT PLATES FOR FIELD AND LABORATORY TESTING FOR E COLI, COLIFORM, AND OTHER BACTERIA OR CON-TAMINANTS IN MEAT, DAIRY PRODUCTS AND OTHER TYPES OF FOOD, AND FOR TESTING TO DETECT YEAST AND MOLD; AND STERILIZA-TION MONITOR TESTING KITS CONTAINING INDICATOR STRIPS OR TAPE, REAGENTS AND RECORD KEEPING CARDS OR BINDERS FOR TESTING THE STERILITY OF SURGICAL AND MEDICAL INSTRUMENTS, EQUIPMENT, AND SUPPLIES , IN CLASS 1 (U.S. CLS. 1, 5, 6, 10, 26 AND 46).

FIRST USE 11-0-1990; IN COMMERCE 11-0-1990.

FOR: NON-MEDICATED SKIN CARE PRO-DUCTS, NAMELY, CLEANSERS, CREAMS, LO-TIONS, MOISTURIZERS, BARRIER CREAMS AND EMOLLIENTS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 1-0-1996; IN COMMERCE 1-0-1996.

FOR: FULL LINE OF BANDAGES, DRESSINGS AND MEDICAL TAPES, NAMELY, ADHESIVE BANDAGES, BANDAGES FOR SKIN WOUNDS, SURGICAL BANDAGES, WOUND DRESSINGS, NON-STICK PADS FOR USE AS MEDICAL DRES-SINGS, MEDICATED COMPRESSES, TRANSPAR-ENT MEDICAL DRESSINGS, HYDROCOLLOID DRESSINGS, COLOSTOMY DRESSINGS, ULCER DRESSINGS, MEDICAL ADHESIVE TAPES, SURGI-CAL TAPES, AND WOUND AND SKIN CLOSURE ADHESIVE STRIPS WITH OR WITHOUT ANTIMI-CROBIAL SOLUTIONS; GAUZE; WOUND HEAL-ING FILLERS WITH OR WITHOUT GAUZE; MEDICATED SKIN CARE PREPARATIONS; SUR-GICAL DISINFECTANTS AND PREPPING SOLU-TIONS; MEDICATED ANTISEPTIC HAND WASHES; AND CULTURE MEDIA, BACTERIOLOGICAL MEDIA AND DIAGNOSTIC PREPARATIONS FOR CLINICAL OR MEDICAL LABORATORY USE, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 2-0-1991; IN COMMERCE 2-0-1991.

FOR: COMPUTER SOFTWARE FOR USE IN THE MEDICAL AND HEALTH CARE FIELDS FOR PROCESSING CLAIMS FOR REIMBURSEMENT, MAINTAINING PATIENT RECORDS, CODING AND GROUPING DATA USED FOR MEDICAL AND HEALTH CARE RESEARCH, AND FOR REPORTING HEALTH TRENDS AND OTHER MEDICAL DATA; AND FULL LINE OF RESPIRATORY FACE MASKS FOR FILTERING OUT GERMS, DUST AND POLLEN, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 5-0-1992; IN COMMERCE 5-0-1992.

FOR: FULL LINE OF ORTHOPEDIC CASTINGS TAPES, SPLINTS, REINFORCING STRIPS, ELASTIC BANDAGES, AND SUPPORT BANDAGES AND COMPRESSION WRAPS; COMPOSITE FABRICS CONTAINING FIBERGLASS AND RESINS FOR USE IN MAKING CASTS; PADDING FOR ORTHOPEDIC CASTS; ORTHOPEDIC CASTING TOOLS; FULL LINE OF STETHOSCOPES; FULL LINE OF SURGICAL MASKS, FACE SHIELDS, AND RESPIRATORY MASKS FOR MEDICAL PURPOSES; FULL LINE OF SURGICAL AND MEDICAL PROCEDURE DRAPES AND SHEETS; PATIENT ISOLATION DRAPES; MEDICAL-EQUIPMENT ISOLATION DRAPES; NON-ADHERENT SHEETING FOR BEDS, STRETCHERS AND EXAM TABLES; SURGICAL GOWNS; COMPRESSION BANDAGES; SURGICAL COMPRESSES; MEDICAL THERMOMETERS; FULL LINE OF MEDICAL ELECTRODES WITH OR WITHOUT CHEMICAL CONDUCTORS AND WET GELS FOR USE IN CARDIAC, ELECTROCARDIOGRAPH, ELECTROENCEPHALOGRAPH AND OTHER TYPES OF PATIENT MONITORING; LEADS AND CONNECTORS FOR USE WITH MEDICAL ELECTRODES; DEFIBRILLATION PADS; ELECTROSURGICAL PADS, PLATES AND ADAPTERS TO REMOVE RF CURRENT FROM A PATIENT'S BODY DURING ELECTROSURGERY; THERMAL COLD AND HOT PACKS FOR FIRST AID AND THERAPEUTIC PURPOSES; EYE PATCHES FOR MEDICAL USE; PADDING FOR USE BETWEEN MEDICAL EQUIPMENT AND PATIENTS OR FOR ELEVATING OR POSITIONING LIMBS; POUCHES FOR HOLDING SURGICAL AND MEDICAL INSTRUMENTS; ISOLATION POUCHES AND BAGS FOR STORING ORGANS, TISSUE AND OTHER BODY PARTS FOR TRANSPLANTS AND LABORATORY TESTING; AND FULL LINE OF STERILIZED AND NON-STERILIZED FASTENING AND COMPRESSION SURGICAL WRAPS, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 6-0-1990; IN COMMERCE 6-0-1990.

FOR: ATHLETIC TAPE AND ATHLETIC SUPPORT AND COMPRESSION WRAPS FOR KNEES, WRISTS, ANKLES, ELBOWS, LEGS AND ARMS, IN CLASS 28 (U.S. CLS. 22, 23, 38 AND 50).

FIRST USE 0-0-1993; IN COMMERCE 0-0-1993.

OWNER OF U.S. REG. NOS. 1,181,981, 1,234,260 AND OTHERS.

THE MATTER SHOWN IN BROKEN LINES INDICATES THE RELATIVE PLACEMENT OF THE MARK ON A TYPICAL PACKAGE FOR THE GOODS AND IS NOT CLAIMED AS A FEATURE OF THE MARK.

SER. NO. 76-138,263, FILED 9-29-2000.

ALICIA COLLINS, EXAMINING ATTORNEY

# Exhibit 5





## 3M COVID-19 Anti-Fraud, Anti-Price Gouging, and Anti-Counterfeiting Reporting

Feedback

### Have a concern to report related to Fraud, Price Gouging or Counterfeit product? Fill out form below

At 3M, we are committed to doing all we can to help combat the fraudulent, price gouging, and counterfeit activity that is unfortunately occurring in connection with COVID-19. 3M will not tolerate any such activity by 3M authorized channel partners and we will aggressively pursue third-parties that seek to take advantage of this crisis. We are working with law enforcement authorities around the world – including, in the U.S., the U.S. Attorney General, State Attorneys General, and local authorities.

### COVID-19 Fraud

*Please complete as much of the information requested below as possible. Fields marked with an asterisk are required. Once you submit this report, you will receive an email notification that 3M has received the report. We request that you reply to that email and attach any copies of invoices, contracts, pictures of product and any other relevant documentation that can help us to investigate the situation.*

### Requestor Information

First Name*

Last Name*

Requestor Type*

Select One ▼

Company Name (if applicable)

Email/Business Email Address*

Phone/Business Phone Number*

Country/Region*

United States ▼

Feedback

### Tell Us About the Fraud You Would Like to Report

Where is the fraudulent offer or conduct occurring?*

Select One

Please provide specific web page or URL link to the fraudulent offer

## Alleged Solicitor/Seller Information

*Please provide as much information as possible.*

**Seller First Name**

**Seller Last Name**

**Seller Company**

**Seller Email**

**Seller Phone**

**Seller Country/Region**

Select One ▼

**Seller's Website**

## Fraud Product Details

**Product 1\***

Select One ▼

**Product 1 Price**

**Product 1 3M SKU**

**Product 1 Quantity**

**Product 2**

Select One ▼

**Product 2 Price**

**Product 2 3M SKU**

**Product 2 Quantity**

**Product 3**

Select One ▼

**Product 3 Price**

Feedback

Feedback

Feedback

Product 3 3M SKU

Product 3 Quantity

**Product Fraud Details***

*Provide as much detail about the interaction as possible including how you first contacted the seller and what information did the seller provide you regarding the product*

Please be aware that the information you supply about yourself, or any aspect of 3M's operations may result in actions or decisions that may affect others. We ask you to provide only information that, to the best of your knowledge, is correct. You will not be sanctioned for submitting information in good faith, even if it turns out to be inaccurate. However, if you knowingly provide false or misleading information, it may result in disciplinary or judicial action.

3M respects your right to privacy. 3M will collect, use, and disclose the personal information you provide in accordance with our Privacy Policy. In addition to the third party disclosures described in our Privacy Policy, 3M may share all personal information you provided in this form with third parties including but not limited to law enforcement agencies, governmental authorities, regulators or courts: (i) to comply with a law, regulation, court order, or other legal process; (ii) to meet our legitimate interest in detecting, preventing, investigating and responding to fraud, intellectual property infringement, violation of our contracts or agreements, violation of law, or other misuse of 3M products or services; (iii) to protect 3M rights or property or yours or others' health, safety, welfare, rights, or property; or (iv) under similar circumstances to address fraud and counterfeit activity related to the Covid 19 situation. If 3M elects to share personal information with law enforcement agencies, governmental authorities, regulators or courts, 3M will have no control over that personal information.

**SUBMIT**

The brands listed above are trademarks of 3M.

United States - English

**3M**   Legal Information   |   Privacy Policy   |   DMCA
© 3M 2020. All Rights Reserved.